## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### No. 8:21-cv-1318-WFJ-CPT

**SC MAINTENANCE, INC.**,

      Plaintiff,

v.

**SUSAN MARTIN and**
**NATALIE MARTIN and**
**CENTURY BUILDING**
**MAINTENANCE**,

      Defendants.

_____/

### SC MAINTENANCE, INC.'S EXPEDITED MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, SC Maintenance, Inc. ("SCM" or "Plaintiff"), pursuant to Federal Rule of Civil Procedure 65, moves this Court on an expedited basis to enter a preliminary injunction against Defendants, Susan Martin and Natalie Martin (collectively, the "Martins") and Century Building Maintenance ("CB"), and says:

### INTRODUCTION

Defendants became employed with SCM in August of 2020 as sales managers. As a condition of being employed by SCM, the Martins were required to sign identical "Non-Compete Agreements" with SCM, which they did on August 11, 2020. *See* **Exhibits 1** and **2**. SCM paid the Martins both a base salary and commission in exchange for their contractual promises not to compete with SCM or solicit its clients.

1

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 • Miami, FL 33131

During their employment with SCM, the Martins were exposed to and obtained intimate knowledge of SCM's processes and methods for identifying suitable job opportunities; formulating competitive bids; the identities of subcontractors to engage in regions where SCM performs work; SCM's customer lists; the jobs SCM was pursuing and bidding on; pricing analysis; and SCM's strengths and weaknesses. This information is not available to the public or SCM's competitors.

The Martins have now broken the promises in their Non-Compete Agreements, in direct violation of those Non-Compete Agreements. The Martins abruptly resigned from SCM in April of 2021 by having their lawyer send SCM a letter. The confidential SCM information provides the Martins and their new employer, CB, which was formerly a key SCM subcontractor, with an unfair competition over SCM.

SCM has identified multiple active clients and projects that the Martins directly solicited for the purpose of transferring those projects to their new employer, CB. Notably, the Martins were directly involved in bidding on those projects while employed by and receiving a salary plus commission from SCM. The Martins relied on the valuable, confidential business information they learned from their employment at SCM to solicit those SCM clients.

Following the Martins' resignation from SCM, SCM conducted an investigation and learned that the Martins deleted all of their SCM emails in an effort to conceal the contents thereof, which, upon information and belief, the Martins did to hide who they were speaking to and which projects they were working on before their resignation so they could contact the relevant clients without SCM finding out.

The Martins' deliberate efforts to spoliate evidence were not a complete success as SCM has been able to recover at least some of those communications.

On April 15, 2021, CB and SCM entered into a Subcontract Agreement that prohibited CB from soliciting or hiring any SCM employee. *See* **Exhibit 3**. CB materially breached the Subcontractor Agreement with SCM by hiring the Martins in May of 2021 to directly compete against SCM.

Because SCM has a legitimate business interest in enforcing Defendants' promises, and because their conduct presents immediate and irreparable ongoing harm to SCM, the Court should enter a preliminary injunction enjoining Defendants from continuing to breach their contractual promises.

## STATEMENT OF FACTS

### A. <u>SCM and its business interests</u>

SCM, formed in 2015, is based out of Davenport, Florida, and is in the business of post-construction cleaning for newly constructed real property. Declaration of Scott Clements, ¶ 4 ("Clements Decl."). Post-construction cleaning is a phase in the construction process that occurs after the completion of a new construction project before the project is turned over to the owner. *Id.*, ¶ 5.

For most jobs, the general contractor on a given project retains SCM to perform the laborious process of cleaning, in depth, all surfaces, fixtures, appliances, windows, and the HVAC system following construction of a new structure before it is turned over to its owner. *Id.*, ¶ 6. SCM has excelled in the post-construction cleaning business through its establishment and implementation of unique processes for identifying jobs;

strategically pricing contract bids; development of a list of valuable clients; identifying and building relationships with appropriate subcontractors in many markets across the country and consistently performing quality work. *Id.*, ¶ 7. SCM operates in all 50 states. *Id.*, ¶ 8.

Certain SCM personnel, including the Martins, are provided with and exposed to valuable, confidential SCM business information as an ongoing investment designed to give SCM an advantage over its competitors. *Id.*, ¶ 9. A competitor of SCM, such as CB, that obtains the benefit of this information and training by hiring a former SCM employee in contravention of their contractual promises gains an unfair competitive advantage over SCM in any and every market in which the competitor and SCM operate. Consequently, SCM provides its employees that are exposed to such information economic benefits in exchange for their agreements not to compete with SCM. *See* Exs. 1, 2.

SCM must bid on any job it desires to obtain. Clements Decl., ¶ 10. Bidding on jobs is open to a significant number of competitors all competing to be awarded the same contract. *Id.* Thus, bid pricing is a critical component of being awarded jobs. *Id.*

SCM has spent over five years performing jobs all over the country to learn the factors and considerations that impact the competitiveness of a bid while ensuring profitability of the project. *Id.*, ¶ 11. Another key component of bid pricing involves having an established network of subcontractors throughout the country that can be engaged to perform services at the relevant project site. *Id.*, ¶ 12.

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 • Miami, FL 33131

SCM employees, such as the Martins, are also exposed to and gain intimate knowledge of SCM's client lists that took years of effort to build; the identity of SCM's most valuable repeat clients, including the preferences and needs for those valuable clients; SCM's active jobs; which jobs SCM is bidding; SCM's response to any request for bids, including the amount of its proposal; SCM's strengths and weaknesses in bidding projects and providing services; and the identity and capabilities of subcontractors SCM has used for prior projects. *Id.*, ¶ 13. The foregoing business information has substantial economic value and is not publicly available. *Id.*  Any competitor who obtains the foregoing valuable SCM business information would gain an unfair advantage over SCM.

**B. The Martins' employment with SCM and access to SCM's valuable and confidential business information**

The Martins were privy to the foregoing valuable, confidential business information listed above, and their use of this information and use of it in their new employment with CB will irreparably damage SCM's legitimate business interests. *Id.*, ¶ 14.

As sales managers for SCM, the Martins were responsible for identifying potential jobs; working with SCM's team to formulate bids; pricing jobs; communicating with project clients on behalf of SCM, both before, during, and after the bid process; and working with SCM's subcontractors local to any given project. *Id.*, ¶ 15. Thus, through their employment at SCM, the Martins learned of the identity of every active SCM client; the date and location of all active SCM projects; SCM's

bid amount on every active project; SCM's costs for every active project; and which subcontractors to engage for any given project. *Id.*, ¶ 16.

The Martins regularly served as the primary point of contact between SCM and project clients, which allowed the Martins to develop a rapport with SCM's valued clients. *Id.*, ¶ 17. This exposure allowed the Martins to learn which clients most consistently referred SCM business, where those clients conduct work, the identity of key decision makers, and the specific needs of those clients – all of which took SCM years of work and expense to develop. *Id.*

Throughout their employ with SCM, the Martins repeatedly listed their private cell phone numbers in project proposals as the number clients should call if they wanted to contact SCM in connection with a project, despite SCM's many requests that the Martins cease this practice. *Id.*, ¶ 18. The Martins did that to distance SCM from its own clients to ensure that they could transition those clients away from SCM and to another company in the event the Martins left SCM.

The confidential business knowledge the Martins learned from SCM is highly transferrable to SCM's competitors, such as CB. To SCM's knowledge, prior to May of 2021, CB did not independently bid on jobs in the way that SCM did; rather, CB typically served as a sub-of-a-sub on projects. But, now, with the Martins' knowledge of SCM's confidential business information listed above, CB can benefit from the Martins' intimate knowledge regarding which clients to whom SCM most frequently provides services, what SCM's strengths and weaknesses are, the acceptable price point to obtain their work, how to price a job competitively while ensuring

profitability, and coordinate with internal staff to bid on and perform jobs in a competitive fashion. SCM does not share any of this information with the public, much less its competitors. *Id.*, ¶ 19. The confidential information the Martins learned from SCM provides them and CB with an unfair competitive advantage of SCM that they would not have but for their employment with SCM.

### C. The Martins' promises not to compete with SCM and breaches thereof

SCM requires certain of its employees to agree to restrictive covenants in exchange for employment to protect SCM's valuable, confidential business information, avoid common unfair methods of competing that are common in this industry, and avoid solicitation of current or prospective clients by former employees. *Id.*, ¶ 20. The Martins' Non-Compete Agreements outline the conditions of the prohibited conduct.

The Non-Compete Agreements prohibit the Martins from: (1) directly or indirectly engaging in any aspect of business that is similar in nature to the business of SCM, and (2) soliciting any client of SCM for themselves or for the benefit of a third party that is engaged in a similar business to SCM. *See* Exs. 1, 2. The Non-Compete Agreements prohibit the Martins from doing the foregoing acts within 3,000 miles of Davenport, Florida, for a period not to exceed two years of the culmination, completion, or termination of the Non-Compete Agreements. *Id.*

The Non-Compete Agreements expressly address the propriety of injunctive relief in the event of a breach by the Martins. By signing the Non-Compete Agreements, the Martins acknowledged and agreed that if they violated the

7

agreements, SCM will suffer irreparable harm and may appropriately seek injunctive relief against them.

In April of 2021, the Martins abruptly terminated their employment with SCM and began working as salespeople for SCM's subcontractor, CB. Clements Decl., ¶ 21. The Martins' sudden and unexplained resignation prompted an internal investigation, which revealed that the Martins had been actively working to transfer SCM jobs elsewhere, including CB. *Id.*

In July of 2020, SCM bid on a job located in Hagarstown, Maryland (the "Maryland Project"), with the Martins' assistance. *Id.*, ¶ 22. The job had a target performance date in 2021, which the Martins knew. *Id.* On July 25, 2020, Defendant Susan Martin internally confirmed to other SCM personnel that SCM had been awarded the Maryland Project. *Id.* Thereafter, Plaintiff learned that the Maryland Project had been reassigned to Susan Martin with CB. *Id.* Accordingly, the Martins attempted to transfer the Maryland Project to either themselves or CB. *Id.* Upon informing the client on the Maryland Project that they had already awarded SCM the job, the client honored their initial agreement with SCM. *Id.* The Martins materially breached the Non-Compete Agreements by competing with SCM and soliciting the client on the Maryland Project.

On or around March 10, 2021, SCM, with the Martins' involvement, bid on a project in Williamsburg, Virginia (the "Virginia Project"). *Id.*, ¶ 23. Defendant Susan Martin submitted the quote on behalf of SCM from her official SCM email address.

*See* **Exhibit 4**. The Virginia Project proposal was submitted under SCM's name. Clements Decl., ¶ 23. On or around March 10, 2021, SCM received written confirmation that it had been awarded the Virginia Project. *Id.* On May 12, 2021, the client on the Virginia Project wrote Defendant Susan Martin on her SCM email asking: "Was this contract through SC or CB maintenance?" *See* **Exhibit 5**. SCM did not proceed with work on the Virginia Project. The Martins materially breached the Non-Compete Agreements by directly competing with SCM and soliciting the client on the Virginia Project.

On or around April 5, 2021, SCM, with Defendants' involvement, bid on a project in Michigan in response to a request for proposal (the "Michigan Project"). Clements Decl. ¶ 24. Defendant Susan Martin submitted a proposal on behalf of SCM from her official SCM email address. *See* **Exhibit 6**. In mid-April 2021, SCM a received written confirmation that it had been awarded the Michigan Project. Clements Decl. ¶ 24. On April 30, 2021, SCM received an email from the Michigan Project client requesting that SCM provide its certificate of insurance and proof of workers' compensation insurance for the Michigan Project. *See* **Exhibit 7.** SCM provided the requested documentation, but on May 3, 2021, the client told SCM that the documentation had to match the name on the contract. Clements Decl. ¶ 24. The name on the contract was CB, even though SCM had already received a written confirmation that it had been awarded the contract for the Michigan Project. *Id.* Thus, Martins again

materially breached the Non-Compete Agreements by directly competing with SCM and soliciting the client on the Michigan Project.

On or around April 7, 2021, SCM, with the Martins' involvement, bid on two separate projects: one in Smyrna, Tennessee (the "Tennessee Project") and the other in Tampa, Florida (the "Tampa Project"). *Id.*, ¶ 25. On May 17, 2021, CB, with Defendant Natalie Martin's assistance, bid on the Tennessee Project. *Id.*, ¶ 26. Upon information and belief, CB, with Defendant Natalie Martin's assistance, also bid on the Tampa Project. *Id.*, ¶ 27. On May 17, 2021, Defendant Natalie Martin contacted the representative for the Tennessee Project from the email address "natalie@cbmaintenance.net" directing him to the proposal in CB's name, asking for an update on the status of the proposal, informing the client that she was no longer with SCM and that she has moved onto another nationwide cleaning company (CB), and telling the client "I look forward to working with you." *See* **Exhibit 8**. Defendant Natalie Martin's email signature block identified herself as "Sales Manager for CB Maintenance" and provided an email of "natalie@cbmaintenance.net." *Id.*

Defendant Natalie Martin also contacted the Tampa Project representative on May 17, 2021, from her CB email asking for an update on the Tampa Project, again with the same signature block identifying herself as "Sales Manager for CB Maintenance" and an email of "natalie@cbmaintenance.net." *See* **Exhibit 9**. Thus, Martins materially breached the Non-Compete Agreements by directly competing

with SCM and soliciting clients on the Smyrna Project and Tampa Project. The Smyrna Project and Tampa Project were ultimately awarded to other contractors.

SCM has been working with CB since 2015. Clements Decl., ¶ 28. Over the course of that business relationship, SCM developed an understanding as to the regions where CB does work, which had historically been in California, where CB is headquartered. *Id*. To SCM's knowledge, CB did not historically offer services in the Michigan, Virginia, Maryland, Florida, or Tennessee markets whereas the Martins worked on SCM projects in all of those markets, among many others. *Id*.

Given that CB did not (to SCM's knowledge) operate in the Michigan, Virginia, Maryland, Florida, or Tennessee markets prior to CB hiring the Martins and is now bidding on jobs in those markets among other markets; the Martins made prior attempts to divert SCM contracts to CB; CB regularly communicated with the Martins during their employ at SCM; and from the timing of the foregoing events, it is clear that the Martins, in clear violation of their Non-Compete Agreements, are (1) engaging in aspects of business similar to Plaintiff's and (2) soliciting Plaintiff's clients for the benefit of themselves and/or CB.

**D. CB's promise not to solicit former SCM employees and breaches thereof**

On April 15, 2021, SCM and CB entered into a Subcontractor Agreement, which provides, in relevant part: "Subcontractor shall not solicit or hire any employees of SC Maintenance . . . without the prior written consent of SC Maintenance." Exhibit 3 (the "Subcontractor Agreement"). Thus, CB materially breached the Subcontractor Agreement when it hired Defendants in May 2021.

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 • Miami, FL 33131

The Subcontractor Agreement acknowledges that money alone would not adequately compensate SCM for the damage to its business as a result of CB's breach of the non-solicitation provision, and that in the event of a breach, SCM would be entitled to preliminary and permanent injunctive relief in addition to any other available remedies.

**E.** **SCM's business interests threatened by Defendants' conduct**

The Martins utilized Plaintiff's business opportunities, resources, and confidential information, including the status of contract bids and customer lists, to learn what they needed to identify job opportunities, successfully bid on those jobs so they are awarded to the contractor of the Martins' choosing, and divert the job away from Plaintiff, thereby depriving SCM of business opportunities and goodwill.

The Martins' familiarity with Plaintiff's business is the primary, if not sole, reason they could pursue and divert and attempt to divert projects that SCM had already secured just weeks after the Martins resigned from SCM. The Martins knew from their experience and employment with Plaintiff to identify a specific business opportunity that SCM had already secured, used SCM's subcontractor to take the place of SCM, and caused another person or entity to perform work that SCM had been contracted to perform. The Martins directly relied on their intimate knowledge of SCM's confidential business information to usurp SCM's business opportunities, interfere with already established contractual relationships, and to compete against SCM in material breach of the Non-Compete Agreements.

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 ▪ Miami, FL 33131

The valuable business information that the Martins obtained from SCM and brought to CB enabled CB to immediately move from being SCM's subcontractor to its competitor. This is precisely why SCM requires its subcontractors such as CB to sign non-solicitation agreements, so as to ensure that subcontractors cannot obtain detailed knowledge of how SCM performs post-construction cleaning services and then poach its employees with knowledge of valuable, confidential information to obtain a competitive advantage that CB would not have had unless CB had hired an SCM employee with knowledge of valuable, confidential business information.

The post-construction service industry is highly competitive and profit margins are tight. Clements Decl., ¶ 29. The Martins' current employer and SCM—within the market area covered by the Non-Compete Agreements—now compete for essentially the same projects. *Id.*, ¶ 30. The confidential, valuable business information listed above, if used further by the Martins, would create an unfair competition in favor of the Martins and CB while concurrently putting SCM at a disadvantage in the post-construction cleanup sector and cause SCM to lose countless opportunities and its competitive edge developed through years of effort and expense. *Id.*, ¶ 31.

Having received valuable, confidential information from SCM, the Martins are now in a position to use the information to SCM's detriment, and have already done so on multiple occasions, as outlined above, in ways unlikely to be measurable or quantifiable in terms of monetary damages in that they might use the confidential and valuable SCM business information to compete with SCM in a manner that a competitor without this information could not.

13

The information the Martins obtained during their employment with SCM will cause irreparable harm to SCM if the Martins are permitted to use it directly or indirectly in the employ of CB, a competitor, which the Martins have already done and will continue to do unless enjoined.

## LEGAL STANDARD

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001). This Court may grant a preliminary injunction upon a showing that: (1) the movant has a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) the injunction would not disserve the public interest. *N. Am. Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008). In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995).

Preliminary injunctions are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted). As such, "all of the

14

well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

"For the same reasons that justify an assumption that the employer will be irreparably damaged by breach of a non-compete provision it will customarily be obvious that money damages, even if susceptible of reasonable proof, may not compensate for all aspects of such a violation. Injunctive relief is therefore the 'favored remedy.'" *Silvers v. Dis-Com Securities, Inc.*, 403 So. 2d 1133, 1137 (Fla. 4th DCA 1981).

## I.   SCM IS SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS

Section 542.335(1)(b), Florida Statutes, protects a company's legitimate business interests such as:

1. Trade secrets as defined in s. 688.002(4).

2. Valuable confidential business or professional information that otherwise does not qualify as trade secrets, Substantial relationships with specific prospective or existing customers...

3. Customer, . . . goodwill associated with: . . .

    b.  A specific geographic location; or

    c.  A specific marketing or trade area [and]

4. Extraordinary or specialized training.

§ 542.335(1)(b), Fla. Stat. Information that is not available to the public and is integral to the company's success can constitute "confidential business information" under Section 542.335. *United Subcontractors, Inc. v. Godwin*, No. 11-81329-CIV, 2012 WL 1593173, at *6 (S.D. Fla. Feb. 3, 2012), *report and recommendation adopted*, No. 11-81329-CV, 2012 WL 8652471 (S.D. Fla. Mar. 9, 2012).

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 • Miami, FL 33131

Customer lists, customer purchasing history, customer specifications, pricing and profit structure are all recognized as trade secrets under Florida law. *Vas Aero Services, LLC v. Aruoyo*, 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) ("[D]ocuments containing . . . pricing information have been held to constitute trade secrets under Florida law"); *Benada Aluminum of Fla., Inc. v. Rodriguez*, 712 So. 2d 438 (Fla. 3d DCA 1998) (error to dismiss case where employer alleged misappropriation of customer lists, a customer's purchasing history, customer specifications); *Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. 5th DCA 1995) (affirming trial court's injunction prohibiting the use of company's order edit lists, that contained the mark-up on the item ordered, the profit margin and the names of customers); *Bd. of Regents, State of Fla, v. Taborsky*, 648 So. 2d 748, 752 (Fla. 2d DCA 1994) (notebooks containing proprietary and confidential research were trade secrets); *DeLucca v. GGL Indus., Inc.*, 712 So. 2d 1186, 1187 (Fla. 4th DCA 1998) ("[D]ocuments reflecting income, including rebates from vendors customers' names and address and shipping information" were properly the subject of a permanent injunction); *Sethscot Collection v. Drbul*, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996) (an active customer list containing "a detailed purchasing history" is a trade secret); *Fulford v. Drawdy Bros. Const., II*, 903 So. 2d 1007, 1007 (Fla. 4th DCA 2005) ("The eighteen-month covenant not to compete furthered the former employer's legitimate business interests relating to its bidding process, customer list, and specialized training in the industry.").

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 • Miami, FL 33131

Additionally, under Florida law, "an employer has a legitimate business interest in prohibiting [the] solicitation of its customers with whom the employee has a substantial relationship." *N. Am. Prods. Corp. v. Moore*, 196 F.Supp.2d 1217, 1228 (M.D. Fla. 2002). More specifically, an employer has a legitimate business interest "[w]here an employee ... gains substantial knowledge of h[er] former employer's customers, their purchasing history, and their needs and specifications." *Id*. Because determining damages of an employee's breach of a non-competition agreement is inherently difficult, an injunction is a normal remedy in such cases. *Miller Mech., Inc. v. Ruth*, 300 So. 2d 11, 12 (Fla. 1974).

Here, Defendants signed the Non-Compete Agreements containing an express covenant not to compete that they have materially violated and will continue to violate by unlawfully competing with SCM within the geographic area proscribed by the Non-Compete Agreement, as described above, thereby damaging Plaintiff. The Martins violated the Non-Compete Agreements by directly and indirectly competing against it in a similar business. And working for a competitor such as CB also constitutes material breach of a non-competition agreement. *See Pitney Bowes Inc. v. Acevedo*, 08–21808–CIV–Jordan, 2008 U.S. Dist. LEXIS 61194, at *12 (S.D.Fla. July 28, 2008) (applying Florida law); *T.K. Commc'ns, Inc. v. Herman*, 505 So. 2d 484, 485 (Fla. 4th DCA 1987). Defendants benefited from the use of SCM's valuable, confidential business information because the Martins used that information to solicit active SCM clients, submit competing bids to those clients, and to directly email those clients and solicit their business from their new employer's email addresses.

17

"The right to prohibit the direct solicitation of existing customers is a legitimate business interest, and a covenant not to compete which includes a non-solicitation clause is breached when a former employee directly solicits customers of his former employer." *Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63, 65 (Fla. 2d DCA 2010) (internal quotations and alterations omitted). Plaintiffs further materially breached the Non-Compete Agreements by soliciting SCM clients when they emailed existing SCM clients to solicit their business. Thus, because the Martins knew that the Maryland Project, Virginia Project, and Michigan Project were SCM clients at the time the Martins solicited them, the Martins intentionally violated the Non-Compete Agreements. *See Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209, 1221 (S.D. Fla. 2005) (enjoining former employee from further soliciting the plaintiff's clients and finding that the defendant intentionally violated their non-compete agreements when they solicited clients that they knew were existing customers of the plaintiff).

Defendants had access to all the confidential, information described above and should be enjoined from using such confidential business information to benefit their current employer, CB, and themselves, which they have already done and will continue to do unless the Court enjoins them. *AutoNation, Inc. v. O'Brien*, 347 F.Supp.2d 1299, 1305 (S.D.Fla. 2004) (defendant's access to plaintiff's internal business performance reports as well as policies, procedures, systems, vehicle programs and practices was sufficient to enforce a non-compete agreement).

## II. THE MARTINS' EMPLOYMENT WITH SCM AND THEIR EMPLOYMENT WITH CB PRESENTS A THREAT OF IRREPARABLE HARM TO SCM

Florida Statute § 542.335(1)(j), provides that:

> A court shall enforce a restrictive covenant by any appropriate and effective remedy, including, but not limited to, temporary and permanent injunction. The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of the restrictive covenant.

§ 542.335(1)(j), Fla. Stat. Section 542.335(1), Florida Statutes, further requires the party seeking to enforce the covenant to plead and prove the existence of a legitimate business interest. Legitimate business interests are defined as, inter alia, extraordinary or specialized training, valuable and confidential business or professional information, substantial relationships with specific prospective or existing clients, customers or patients, and customer, patient or client goodwill associated with a specific geographic location.

In Florida, violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement. § 542.335(j), Fla. Stat. Irreparable harm is presumed under Florida law where, as here, the proponent of injunctive relief has adequately pled the violation of a non-compete agreement. *Graphic Bus. Sys., Inc. v. Rogge*, 418 So. 2d 1084, 1086 (Fla. 2d DCA 1982) (explaining that "the practical difficulties of proving irreparable harm would tend to diminish the efficacy of covenants not to compete, which bear the imprimatur of the legislature and the courts of Florida"); *T.K. Comms., Inc.*, 505 So.2d at 486.

When a party seeking enforcement of a restrictive covenant establishes one or more legitimate business interests justifying the restriction, "irreparable injury must be presumed by the Court" and the burden shifts to the employee to establish the absence of such injury. *N. Am. Prods. Corp.*, 196 F. Supp. 2d at 1230; *see also America II Electronics, Inc. v. Smith*, 830 So. 2d 906, 908 (Fla. 2d DCA 2002) ("[A] party seeking to enforce a restrictive covenant by injunction need not directly prove that the defendant's specific activities will cause irreparable injury if not enjoined [since] a presumption of irreparable injury" is created by violation of an enforceable restrictive covenant) (citations and internal quotations omitted).

"Irreparable harm may be presumed in cases of wrongful interference with business relationships." *Patriot Lending Servs., Inc. v. Amerifirst Fin. Corp.*, No. 8:20-CV-264-T-02AEP, 2020 WL 758155, at *1 (M.D. Fla. Feb. 14, 2020) (Jung, J.) ("The loss of customers and good will is an irreparable injury and is difficult to measure."). The Eleventh Circuit Court of Appeals has recognized that loss of goodwill or injury to a business' reputation satisfies the irreparable harm prong of the preliminary injunction analysis. *See Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. Appx. 180, 190 (11th Cir. 2005); *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (explaining that "the loss of customers and goodwill is an 'irreparable' injury"); *see also Dunkin' Donuts Franchised Restaurants LLC v. EMST Donuts, LLC*, 2007 WL 9718746, at *9 (M.D. Fla. Sept. 17, 2007). "A likelihood of damage to reputation is by its nature 'irreparable.' Like trying to un-ring a bell, trying to compensate after the fact for damage to business goodwill and reputation cannot constitute a just and full

20

compensation." *Bentley Motors Corp. v. McEntegart*, 899 F. Supp. 2d 1291, 1303 (M.D. Fla. 2012) (citation omitted).

The Martins had access to a wide variety of confidential information and documents while employed as SCM, as set forth above. SCM has a legitimate business interest in protecting the disclosure and use of such information by people and entities competing directly against SCM, such as the Martins and CB. The use of SCM's confidential information and confidential documents presents a threat of irreparable harm. The Martins have relied on their inside knowledge of SCM's confidential information to divert projects SCM was actively involved with to CB or themselves, or both.

Plaintiff has presented substantial evidence of the Martins contacting companies with whom SCM already began working with to secure projects they worked on while employed at SCM. Specifically, the Martins relied on their knowledge of which jobs SCM had been bidding on and/or had secured and contacted the client for each of those jobs to persuade them to hire CB instead of SCM. SCM's business reputation is likely to be tarnished as a result of the Martins' conduct.

SCM will further be irreparably harmed if CB, its subcontractor, continues to employ the Martins and benefit from their retained knowledge of information learned while employed at SCM, outlined above, to directly compete against SCM. After hiring the Martins, CB, as a former SCM contractor of five years, now has the means to perform the very work SCM is contracted to do on projects because the Martins brought with them SCM's valuable, confidential business information that Defendants

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 • Miami, FL 33131

have already used several times over to steal active SCM clients. Accordingly, CB's employment of the Martins will irreparably harm SCM.

### III.    THE HARM TO PLAINTIFF FAVORS AN INJUNCTION

Under Florida law, courts do not consider any individualized economic or other hardship that might be caused to the party against whom enforcement of a valid restrictive covenant is sought. *See* § 542.335(1)(g), Fla. Stat.

"Courts do not hesitate to find that an injunction's potentially severe impact upon a former employee does not outweigh harm to the former employer for purposes of granting a preliminary injunction as long as the employee has potential for employment that would not violate the non-competition agreement." *United Subcontractors, Inc.*, 2012 WL 1593173, at *12, *report and recommendation adopted*, 2012 WL 8652471.

Here, the Non-Compete Agreements only prohibit the Martins from working in a business similar to the business of SCM. Therefore, the Martins can work in any other area of the construction industry and the impact upon them would not outweigh the harm to SCM if the Martins are permitted to work for SCM's subcontractor, CB, and use the confidential information learned during their employment with SCM—including SCM's strengths and weaknesses, pricing structure, and SCM-provided training—to directly compete against SCM in the same sector.

CB is free to hire anyone else besides the Martins to serve as salespeople. SCM is not asking the Court to stop CB from competing against SCM; rather, SCM is asking the Court to enjoying the Martins as a means of engaging in such competition. Thus,

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 • Miami, FL 33131

the harm to SCM if the Court does not enjoin Defendants far exceeds the harm to Defendants if the Court enters the requested injunction.

## IV.   AN INJUNCTION AGAINST DEFENDANTS WILL FURTHER THE PUBLIC INTEREST

"As evidenced by the Legislature's enactment of Section 542.335 of the Florida Statutes, public policy in Florida favors enforcement of reasonable covenants not to compete." *Autonation, Inc.*, 347 F. Supp. 2d at 1308. "[T]here is a benefit to the enforcement of a valid covenant not to compete and encouraging people to adhere to contractual obligations." *R.J. Gators Franchise Sys., Inc. v. MBC Rests., Inc.*, No. 2:05-cv-00494-VMCDNF, 2005 WL 4655379, at *5 (M.D. Fla. 2005) (granting preliminary injunction to enjoin violations of non-compete agreement). Injunctions serve the public interest where they promote the stability of business relations and the reliability of contracts. *Pirtek USA, LLC*, 2016 WL 584978.

Section 542.335, Florida Statutes, declares the state's public policy favoring the enforcement of such covenants. Under the statute, if a court refuses to enforce a valid restrictive covenant on the basis of public policy, it must specify how the policy is violated via enforcement. *See* § 542.335(1)(i), Fla. Stat. The court must also explain how and why public policy outstrips the protection of legitimate business interests sought by the party seeking enforcement. *Id.*

Here, the Martins and CB have materially breached valid, enforceable covenants not to compete and not to solicit SCM former employees, respectively. The

public interest will be best served by enjoining Defendants material breaches of the Non-Compete Agreements and Subcontractor Agreement.

## CONCLUSION

For the foregoing reasons, SCM respectfully requests that this Court grant the request for injunctive relief and any additional relief the Court deems just and necessary.

**WHEREFORE**, SCM requests that the Court:

A.    Enter a preliminary injunction enjoining and restraining the Martins, their agents, servants, employees and attorneys, and all others in active concert or participation with them, for a period of **18 months and within 3,000 miles of Davenport, Florida** from:

a.    Establishing, engaging, owning, managing, operating, controlling or being directors, officers, employees, salespersons, agents, or representatives of any business in competition with SCM; and

b.    Communicating with or soliciting, or encouraging any other person to communicate with or solicit, any person who is, or during said 18-month period becomes, a customer, supplier, employee, salesperson, agent or representative of SCM;

B.    Enter a preliminary injunction requiring the Martins, their agents, servants, employees, employers and attorneys, and all others in active concert or participation with them who receive actual notice thereof by personal service or otherwise, to return all SCM confidential, proprietary and trade secret information in

24

whatever form, and to delete and purge any such information currently in their possession, custody or control from all electronic devices in their possession, custody or control;

C.     Enter a preliminary injunction enjoining and restraining CB from employing the Martins;

D.     Pursuant to the Non-Compete Agreements and Section 542.335(1)(k), Florida Statutes. Florida's Trade Secrets Act, award to SCM its costs and expenses of this action, including reasonable attorneys' fees; and

E.     Grant to SCM such further relief as this Court deems just and proper.


Dated: June 10, 2021.                    *s/ Andrew R. Schindler*

                                          FBN 124845
                                          *aschindler@grsm.com*

                                          **GORDON REES SCULLY
                                          MANSUKHANI LLP**
                                          100 SE 2nd Street, Suite 3900
                                          Miami, Florida 33131
                                          Tel: (305) 428-5330
                                          *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 10, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and that a true and correct copy of the foregoing was served by electronic notice on all counsel or parties of record on the CM/ECF Service List.

<u>*/s/ Andrew R. Schindler*</u>

**GORDON REES SCULLY MANSUKHANI LLP**
100 S.E. Second Street, Suite 3900 ▪ Miami, FL 33131